ATTORNEYS FOR APPELLANT
Matthew G. Grantham
Huntington, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Andrew A. Kobe
Tamara L. Weaver
Deputy Attorneys General
Indianapolis, Indiana

FILED

Jul 26 2012, 11:16 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 35S04-1110-CR-622

MICHAEL J. LOCK,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Huntington Superior Court, No. 35D01-0906-FD-135
The Honorable Jeffrey R. Heffelfinger, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 35A04-1010-CR-641

**July 26, 2012**

**Massa, Justice.**

Indiana's motor vehicle statutes provide a carve-out through which individuals whose driving privileges are suspended may still commute—provided the device they use to do so meets certain requirements. One requirement is that the "maximum design speed" of such a device may not exceed twenty-five miles per hour.

When the only evidence admitted at trial as to this requirement is that the defendant was traveling forty-three miles per hour on a flat, dry surface, is that evidence sufficient to sustain his conviction?  We think so.

**Facts and Procedural History**

On June 27, 2009, Indiana State Police Trooper Pornteb Nathalang, on his motorcycle, pulled up behind Michael Lock on U.S. Highway 24 in Huntington County.  Lock was riding a 2009 Yamaha Zuma with no license plate.  Trooper Nathalang followed Lock for a quarter-mile at a constant speed on a flat, level surface and determined that Lock was traveling forty-three miles per hour.

Trooper Nathalang then pulled Lock over and learned that Lock's driving privileges were suspended for being a habitual traffic violator.  Lock was arrested and charged with operating a motor vehicle as a habitual traffic violator, a class D felony,[1] and the State also cited him for two traffic infractions.  At his bench trial, Lock and the State stipulated that Lock's Zuma had two wheels, an internal combustion engine with a cylinder capacity of forty-nine cubic centimeters, an engine rating of not more than two horsepower, and an automatic transmission.  The parties also stipulated to Trooper Nathalang's radar track of forty-three miles per hour.

The trial court found Lock guilty of the class D felony, sentenced him to 180 days, and revoked his driving privileges for life.[2]  Lock appealed, arguing first that the habitual traffic violator statute is unconstitutionally vague and second, that the evidence was insufficient to support his conviction.

---

[1] Ind. Code § 9-30-10-16(a) (2010).

[2] The State agreed to dismiss the two infractions.

In a split opinion, the Court of Appeals reversed.  Lock v. State, 952 N.E.2d 280, 281 (Ind. Ct. App. 2011).  Without addressing the constitutional challenge, it found that the State's evidence of the Zuma's speed—standing alone—was too speculative to affirm a conviction.  Id. at 283. We granted transfer, thereby vacating the opinion of the Court of Appeals.  Lock v. State, 962 N.E.2d 650 (Ind. 2011) (table).

**Standard of Review**

In reviewing the sufficiency of the evidence, we examine only "the probative evidence and reasonable inferences" that support the verdict.  Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007).  We do not assess witness credibility, nor do we reweigh the evidence to determine if it was sufficient to support a conviction.  Id.  Under our appellate system, those roles are reserved for the finder of fact.  Instead, we consider only the evidence most favorable to the trial court ruling and "affirm the conviction unless 'no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.'"  Id. at 146–47 (quoting Jenkins v. State, 726 N.E.2d 268, 270 (Ind. 2000)).  This evidence need not overcome every reasonable hypothesis of innocence; it is sufficient so long as "'an inference may reasonably be drawn from it to support the verdict.'"  Id. at 147 (quoting Pickens v. State, 751 N.E.2d 331, 334 (Ind. Ct. App. 2001)).

A constitutional challenge, however, is reviewed de novo.  But we are "a court and not a 'supreme legislature.'  We have no right to substitute our convictions as to the desirability or wisdom of legislation for those of our elected representatives."  State v. Downey, 476 N.E.2d 121, 122 (Ind. 1985).  Thus, we approach such questions with the presumption that the statute is constitutional, and the challenger is burdened to prove otherwise.  Brown v. State, 868 N.E.2d 464, 467 (Ind. 2007).  Any reasonable doubts and constructions as to the statute's validity are resolved in favor of constitutionality.  State v. Lombardo, 738 N.E.2d 653, 655 (Ind. 2000); Brady v. State, 575 N.E.2d 981, 984 (Ind. 1991).

## I. The Statutory Scheme Is Not Unconstitutionally Vague.

A fundamental aspect of our nation's jurisprudence is that criminal statutes must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden so that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" Brown, 868 N.E.2d at 467 (quoting Healthscript, Inc. v. State, 770 N.E.2d 810, 816 (Ind. 2002)); see also Jordan v. DeGeorge, 341 U.S. 223, 230 (1951) ("This Court has repeatedly stated that criminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law."). Accordingly, we have said that due process requires that a penal statute "clearly define its prohibitions." Brown, 868 N.E.2d at 467. If it fails "to provide notice enabling ordinary people to understand the conduct that it prohibits" or "authorizes or encourages arbitrary or discriminatory enforcement" then it is subject to invalidation. Id. Additionally, "there must be something in a criminal statute to indicate where the line is to be drawn between trivial and substantial things so that erratic arrests and convictions for trivial acts and omissions will not occur." Downey, 476 N.E.2d at 123. "It cannot be left to juries, judges, and prosecutors to draw such lines." Id.

Lock argues that Section 9-30-10-16 is unconstitutionally vague because it failed to put Lock on reasonable notice that driving the Zuma was illegal. (Appellant's Br. at 5–9.) The relevant portion of the statute provides that "[a] person who operates a motor vehicle . . . while the person's driving privileges are validly suspended . . . and the person knows that the person's driving privileges are suspended . . . commits a Class D felony." Ind. Code § 9-30-10-16(a). Lock appears to concede that this statute is constitutionally sufficient on its face, (Appellant's Br. at 6), but instead contends that it is unconstitutionally vague as applied to him because of its interplay with several related provisions.

First, the Indiana Code provides that, for the purposes of Chapter 9-30-10, the definition of motor vehicle "does not include a motorized bicycle." Ind. Code § 9-13-2-105(d) (2010). A "motorized bicycle," in turn, is defined as

4

a two (2) or three (3) wheeled vehicle that is propelled by an internal combustion engine or a battery powered motor, and if powered by an internal combustion engine, has the following:

(1)     An engine rating of not more than two (2) horsepower and a cylinder capacity not exceeding fifty (50) cubic centimeters.

(2)     An automatic transmission.

(3)     A *maximum design speed* of not more than twenty-five (25) miles per hour on a flat surface.

The term does not include an electric personal assistive mobility device.

Ind. Code § 9-13-2-109 (2010) (emphasis added).  There is, however, no statutory definition of "maximum design speed," nor have our courts defined the phrase.  This definition gap is the focus of Lock's constitutional argument because "the Zuma's 'maximum design speed' determines whether it is a 'motorized bicycle,' which in turn ultimately determines whether [he] ran afoul of the habitual traffic violator statute."  (Appellant's Br. at 7.)

However, a criminal statute does not need to provide an express or explicit list of prohibited conduct with scientific precision, however much we might think it helpful.  "Condemned to the use of words, we can never expect mathematical certainty from our language."  Grayned v. City of Rockford, 408 U.S. 104, 110 (1972).  Instead, we have repeatedly said that a criminal statute survives a vagueness challenge "'if individuals of ordinary intelligence could comprehend it to the extent that it would fairly inform them of the generally proscribed conduct.'"  Brown, 868 N.E.2d at 467 (quoting Klein v. State, 698 N.E.2d 296, 299 (Ind. 1998)); see also Lombardo, 738 N.E.2d at 656.

Because our analysis on this issue turns on how an ordinary person would interpret the statute, resort to legal definitions and scientific sources is less desirable than consultation of standard language dictionaries.  See Brown, 868 N.E.2d at 467.  And doing so shows that a person of ordinary intelligence would interpret this statutory definition of "motorized bicycle" to

5

exclude any devices whose highest possible speed—as conceived of, planned, or devised—is more than twenty-five miles per hour.[3]

But there remains the question of *by whom* the design must be made—either by a manufacturer or a subsequent modifier, or both. Lock argues that "maximum design speed" is "an integrated scientific phrase that quantifies the speed that the maker of the vehicle intended, not the speed the vehicle could actually go." (Appellant's Br. at 10.) But at oral argument, counsel for both sides noted the ability of individuals to modify the engine of a motorized bicycle in order to allow it to exceed twenty-five miles per hour.

This is not an unforeseeable occurrence, and we think it equally reasonable that the legislature assumed this possibility as well—and therefore chose the broader "maximum design speed" language over "maximum manufacturer's design speed" or Lock's suggested "maximum design velocity." (Appellant's Br. at 10.) Most importantly, we think an ordinary person examining the statute would reach a similar conclusion: that the statutory provision looks initially to the original manufacturer's maximum design speed, but also encompasses any subsequent modifications or redesigns.

In any event, it seems apparent that the statutory scheme is constitutionally sound in that it fairly informs the general public as to what conduct is prohibited. And it does so in a way that

---

[3] See, e.g., Webster's Third New International Dictionary 611 (Philip Babcock Gove, ed., 1993) ("design" means to conceive of, plan out, or to devise for a particular use or function). Likewise, "maximum" means "greatest in quantity or highest in degree attainable or attained". Id. at 1396. Finally, "speed" in this context refers to the object's "rate of motion." Id. at 2189.

The State put forth a definition at trial, based on an online dictionary, and Lock concedes that this definition was plausible. It proposed that "design" refers to "an underlying scheme that governs functioning, developing, or unfolding" or something done aimed at a "particular purpose." (Appellant's Br. at 11–12.) This is not dissimilar to the definition we give today.

uses plain, ordinary language to draw clear lines between trivial and substantial conduct, using a series of quantifiable terms and provisions.

However, Lock contends that the statute is unconstitutionally vague because—notwithstanding the State's plausible definition (and the definition we provide today)—"the first time Lock knew his Zuma had a 'maximum design speed' of more than 25 miles per hour would have been after he got pulled over going 43 miles per hour. This is not sufficient notice to warn Lock of impending criminal penalties." (Appellant's Br. at 8.)

But this argument is not a vagueness challenge—i.e., that an ordinary person would not know what conduct was prohibited. Instead, it says Lock may not have been aware of the capabilities of his Honda Zuma until he was pulled over. This is like a drunk driver asserting a constitutional vagueness challenge because he didn't know how many beers would render him impaired. The claim goes more to mitigation than constitutionality.[4]

Lock also argues that the statute fails to draw a sufficient line between trivial and substantial conduct because "all Lock [or anyone similarly situated] would have to do in order to avoid a habitual traffic violator charge is not exceed 25 miles per hour, as there was no other indication that Lock's Zuma had a 'maximum design speed' greater than what the statute allows." (Appellant's Br. at 8–9.) Therefore, the argument goes, the statutes are arbitrary because a similarly situated person who drove at twenty-five miles per hour or less on the same Zuma would avoid penalty.

---

[4] More to the point, there is no requirement under these provisions that the State prove Lock *knew* the Zuma was not a motorized bicycle, or *knew* it was a motor vehicle. The issue of mens rea only arises under Section 9-30-10-16, in that Lock could only be convicted if it were shown beyond a reasonable doubt that he knew his driving privileges were suspended. Ind. Code §§ 9-13-2-109, 9-30-10-16(a)(1); State v. Cooper, 935 N.E.2d 146, 149 (Ind. 2010) (conviction requires proof of "(1) the act of driving; (2) an HTV adjudication; and (3) that the defendant knew or should have known of the suspension."); State v. Jackson, 889 N.E.2d 819, 822–23 (Ind. 2008).

This overlooks, however, that the similarly situated person *is still breaking the law*. He is just not getting *caught*. This no doubt happens on a daily basis on our streets and highways. Any number of drunk drivers avoid detection, but this does not mean they did not break a law, nor does it render that law unconstitutionally vague.

In sum, Indiana Code § 9-30-10-16 withstands Lock's constitutional challenge.

## II.  The Evidence Was Sufficient to Sustain Lock's Convictions.

Lock and the State stipulated to facts that conclusively establish the Zuma's compliance with all but one of Section 9-13-2-109's requirements:  the Zuma had "two wheels, an internal combustion engine with a cylinder capacity of 49 cubic centimeters, an engine rating of not more than two horse power, and an automatic transmission."  (Appellant's Br. at 2–3; Appellee's Br. at 2); accord Ind. Code § 9-13-2-109(1)–(2).  The parties also stipulated that "Trooper Nathalang observed the Defendant and received a radar track on his vehicle of 43 mph.  The roadway was flat, level, and dry."  Lock, 952 N.E.2d at 281.

The question remaining is whether this piece of evidence—a sole incident of a single radar track—is sufficient to sustain Lock's conviction by showing that the Zuma exceeded the final requirement of Section 9-13-2-109 by virtue of a maximum design speed greater than twenty-five miles per hour.

Much of Lock's argument on the question of proof mirrors his constitutional challenge, by suggesting a stricter definition of "maximum design speed."  (Appellant's Br. at 9–12.)  What he ultimately appears to say, though, is that in order to prove a violation of this provision the State must have shown "that Lock's Zuma was created with a particular purpose or scheme to the effect that the Zuma would exceed 25 miles per hour on any given day."  (Appellant's Br. at 12.)  Because the State offered no evidence of any such purpose or scheme, Lock says, the evidence of

his speed on June 27, 2009, would only allow a court to speculate as to the actual "maximum design speed." (Appellant's Br. at 12.) On these facts, we disagree.

The stipulation concerning Trooper Nathalang's radar track was plainly relevant in determining whether the Zuma's maximum design speed exceeded twenty-five miles per hour, because it had at least *some* tendency to make the existence of that fact more probable than it would be without the evidence. See Ind. Evidence Rule 401. Lock, though, argues that there was no evidence as to the Zuma's condition following this episode, nor any technical evidence as to the manufacturer's specifications, nor was there evidence that Lock had modified the Zuma in any way. (Appellant's Br. at 3, 8.)

But as we have said, in reviewing the sufficiency of the evidence supporting a conviction it is not necessary for that evidence to overcome every conceivable hypothesis of innocence, and we look only at the probative evidence supporting the conviction.[5] And so on the basis of a stipulation that the Zuma was traveling forty-three miles per hour—and in the face of *no* rebuttal evidence at all—it is impossible to claim that *no* reasonable fact-finder could find beyond a

---

[5] Moreover, Lock does not point to affirmative evidence presenting a hypothesis of innocence, but rather to a vacuum in which he presented *no* evidence and now challenges the State for not actively rebutting his non-evidence. Even if our standard of review were not clear in looking only to the probative evidence supporting the conviction, we will not—post-conviction—invent hypothetical evidence that a defendant could have offered—but didn't—and then overturn the conviction because the State failed to rebut that evidence.

Neither does this view impermissibly shift a burden onto Lock to prove that what he drove was a motorized bicycle. See Lock, 952 N.E.2d at 282–83. It was always the State's burden to prove that the Zuma was *not* a motorized bicycle, and to that aim it submitted evidence of the Zuma's actual speed on June 27, 2009. Whether or not it could have submitted additional evidence is not the question; apparently it believed the radar track was enough—and Lock, in turn, chose not to challenge this evidence (indeed, he stipulated to it), apparently believing it would not carry the day. That Lock's strategy failed and the State's succeeded does not raise the specter of an unconstitutional burden-shift.

reasonable doubt that the Zuma had a maximum design speed in excess of twenty-five miles per hour.[6]

## Conclusion

Accordingly, we affirm Lock's conviction and sentence.

Dickson, C.J., Sullivan, and David, JJ., concur.
Rucker, J., dissents with separate opinion.

---

[6] Accord Baird v. State, 955 N.E.2d 845, 848 (Ind. Ct. App. 2011) ("[i]t could reasonably be determined that a vehicle capable of going sixty miles per hour has a maximum design speed of more than twenty-five miles per hour on a flat surface"); Annis v. State, 917 N.E.2d 722, 725 (Ind. Ct. App. 2009) ("Based on this evidence, the scooter was a self-propelled vehicle that was capable of exceeding twenty-five miles per hour on an uphill surface, let alone a flat surface, and had a cylinder capacity greater than fifty cubic centimeters."). Though both Baird and Annis had additional evidence (in Baird, in fact, there was even conflicting evidence) showing the particular devices failed the various requirements of Section 9-13-2-109, in both cases the Court of Appeals drew particular attention to the fact that the defendants were driving at speeds in excess of twenty-five miles per hour at the time they were pulled over. Baird, 955 N.E.2d at 848; Annis, 917 N.E.2d at 725; see also Lock, 952 N.E.2d at 283–84 (Baker, J., dissenting). These cases do not reflect unreasonable speculation—they reflect the possibility of a reasonable inference, which is all that is required.

**Rucker, Justice, dissenting.**

Because I believe the State did not prove the elements of Class D felony operating a vehicle while suspended, I would reverse the trial court and not reach the constitutional issue.

Indiana Code section 9-30-10-16 provides in relevant part, "A person who operates a motor vehicle . . . while the person's driving privileges are validly suspended . . . commits a Class D felony." In turn a "motor vehicle" is defined as a "vehicle that is self-propelled," Ind. Code § 9-13-2-105(a); but, for purposes of Indiana Code section 9-30-10-16, a motor vehicle "does not include a motorized bicycle." I.C. § 9-13-2-105(d). Among other things a "motorized bicycle" is a vehicle with "[a] maximum design speed of not more than twenty-five (25) miles per hour on a flat surface." I.C. § 9-13-2-109(3).

If the vehicle Lock was operating qualifies as a "motorized bicycle" then he was not operating a "motor vehicle" for purposes of the driving while suspended statute. We are thus required to determine what is meant by "maximum design speed." The phrase is not defined by statute and can fairly be interpreted as ambiguous. For example does it mean as the majority suggests, "the original manufacturer's maximum design speed, but also encompasses any subsequent modifications or redesigns"? Slip op. at 7. Or does it mean as Lock suggests that the vehicle, "was created with a particular purpose or scheme to the effect that the Zuma would exceed 25 miles per hour on any given day"? Slip op. at 9 (quoting Appellant's Br. at 12). Another possibility is the maximum speed at which a motor vehicle can be operated safely on a road in perfect condition. See McGraw Hill Dictionary of Scientific & Technical Terms 580 (6th ed. 2003).

"In construing statutes, words and phrases will be taken in their plain or ordinary and usual sense unless a different purpose is clearly manifest by the statute itself, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import." George v. Nat'l Collegiate Athletic Ass'n, 945 N.E.2d 150, 156 n.8 (Ind. 2011) (quoting Ind. Dep't of State Revenue v. Colpaert Realty Corp., 109 N.E.2d 415, 418-19 (Ind. 1952)). In this case the majority appears to apply the "plain or ordinary" meaning

component of the foregoing rule.  See slip op. at 6 n.3.  But I am not sure this is adequate to the task.  First, it appears to me that "maximum design speed" is a technical phrase.  However neither party provides us with any guidance of the phrase's technical import or how the phrase is used in the auto manufacturing industry.  Second, as a matter of statutory interpretation it is obvious the Legislature decided that not all vehicles require an operator's license for purposes of the driving while suspended statute.  So, it carved out an exception for certain vehicles, namely motorized bicycles.  Applying the maxim that "penal statutes must be construed strictly against the State," State v. McGraw, 480 N.E.2d 552, 553 (Ind. 1985), I would read Indiana Code section 9-13-2-109 evincing the Legislature's intent to exclude those motorized bicycles which, among other things, a manufacturer has designed to travel safely at a maximum speed no greater than twenty-five miles an hour.  That is not to say that the vehicle is incapable of traveling in excess of that speed.  Indeed it may very well do so, even if it means damage to the engine or other component parts.  The salient point however is the maximum speed at which the manufacturer designed the vehicle to travel.

The statute being thus construed, the actual speed Lock was traveling has no relevance to the question of "maximum design speed."  And having introduced no evidence indicating the speed at which Lock's vehicle was designed to travel, the State failed to prove Lock was operating a motor vehicle within the meaning of Indiana Code section 9-30-10-16.  Stated somewhat differently, the State had the burden proving the exception, namely:  that the vehicle Lock was operating was not a motorized bicycle.  The State failed to carry its burden.[1]  I would therefore reverse Lock's conviction.

_____

[1]See, e.g., Lyles v. State, __ N.E.2d__, No. 49S02-1201-CR-49, slip op. at 3 n.3 (Ind. June 29, 2012) ( citing Russell v. State, 50 Ind. 174, 174 (1875)).  "[I]n determining whether a statutory exception is a material element or an affirmative defense, we assess the location of the exception relative to the location of the definition of the principal offense.  If the exception is closely connected with the clause creating the offense, the exception is a material element of that offense and must be proven by the State."  Id.  "If, however, the exception is contained in a subsequent clause or statute, the exception is an affirmative defense that must be raised by the defendant."  Id.  Here the exception was closely connected with the clause creating the offense.

2