# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 26 2016, 8:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald E. C. Leicht
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

I.C. (Minor Child)

And

J.C. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 26, 2016

Court of Appeals Case No.
34A02-1509-JT-1531

Appeal from the Howard Circuit Court

The Honorable Lynn Murray, Judge

Trial Court Cause No.
34C01-1504-JT-104

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, J.C. (Mother), appeals the trial court's termination of her parental rights to I.C. (Child). [1]

We affirm.

## ISSUES

Mother raises two issues on appeal, which we restate as follows:

1) Whether Mother waived her challenge of the trial court's dispositional order on vagueness grounds; and

2) Whether Mother waived her argument that the Department of Child Services (DCS) failed to provide adequate services to reunify her with Child.

## FACTS AND PROCEDURAL HISTORY

Child was born to Mother on July 20, 2007. In February of 2012, DCS received a report that Mother was threatening to kill Child and her other two younger children at Meijer in Kokomo, Indiana. Mother brought her three children to the store in an attempt to contact the younger children's father, who was employed there. Mother appeared to be overwhelmed and unable to

---

[1] Child's biological father is unknown and is not part of these proceedings.

handle the children. Mother stated that she was suffering from postpartum depression and was in need of medication. DCS initiated an Informal Adjustment and proceeded to inspect Mother's residence, which DCS found to be below minimal sanitary norms and unsuitable for the children. The following day, after family members cleaned the residence, DCS returned the children to Mother's care and later closed the initial adjustment on July 30, 2012.

[5] On July 26, 2013, DCS received another report alleging that Mother and her boyfriend yell and curse at Child and her half-siblings, that they get into physical fights in front of the children, that the residence is unsanitary, that there is a foul smell emitting from the residence, and that the stove and refrigerator are not working. DCS attempted to contact the family, however, all attempts were unsuccessful until July 31, 2013.

[6] On July 31, 2013, DCS visited the family's residence and observed trash on the front porch, sidewalk, and driveway, with two old diapers and a pair of girl's bikini bottoms lying on the ground. There was a strong odor of animal feces and urine emitting from the residence. Mother was observed to arrive home with Child and her half-siblings in a vehicle without proper car-seats or boosters for the children. Mother did not allow DCS into the residence to check the living conditions and stated that they were in the process of moving in after the house had recently been flooded. Mother also stated that the residence was not suitable for the children, and they had been staying with her relatives. After obtaining permission from one of the relatives, who owned the family's

residence, DCS inspected the house and found it to be unsanitary and unsuitable for the children. Inside, DCS found a small zoo—consisting of a puppy, a very large potbellied pig, snakes, rabbits, and cats. DCS confirmed that the stove and refrigerator were not functional. Further, when DCS caseworkers engaged the children, they stated, contrary to Mother's contention that they stayed elsewhere, that they all slept on the couch inside the residence. Neighbors also informed DCS that the family's residence had not been flooded. When DCS caseworkers attempted to explain the allegations and discrepancies to Mother, she became angry, verbally abusive, and threatened them. She started yelling at her neighbors, whom she suspected of reporting her to DCS, and told them, "I have a gun and I know how to use it." (Ex. 1, p. 2). As a result of the assessment, DCS caseworkers decided to remove all three children due to the conditions of the home, allegations of Mother's maltreatment of the children, and Mother's threatening statements and demeanor. Child was placed with Mother's cousin and the two younger children were placed with their biological father.[2] After the children were removed, Mother informed DCS that she was supposed to take medication for her hormones and depression; however, she had not taken the medication for a long time.

[7] On August 2, 2013, DCS filed its petition alleging that Child was a child in need of services (CHINS) based on unsanitary home conditions, and Mother and her boyfriend engaging in "physical fights" in front of Child and her half-

---

[2] Child's younger half-siblings remained with their biological father after he obtained custody over them.

siblings. (DCS Ex. 3, p. 2). On the same day, the trial court held a detention hearing where Mother appeared with counsel. At the conclusion of the hearing, the trial court ordered Child to remain in the relative's care.

[8]     On September 30, 2013, the trial court held a fact-finding hearing where Mother stipulated that her home was unsafe and unsanitary. The trial court adjudicated Child to be a CHINS. The trial court also took judicial notice of DCS's preliminary report of investigation which documented concerns regarding Mother's mental health and behavior and Child's well-being while in her care. The trial court ordered Mother, in relevant part, to:

> a) Participate in supervised visitation with [Child]. DCS was to conduct home visit of Mother's residence and transition visitation into her home if the home was found to be clean and appropriate for visitation. DCS had discretion to transition the visitation to semi[-]supervised and/or unsupervised as appropriate.
>
> b) Participate in a mental health evaluation and follow the recommendations of the evaluation.
>
> c) Participate in Homemaker services.
>
> d) Participate in Parent Educator services.
>
> e) Not utilize corporal punishment [on Child].

(Appellant's Br. pp. 22-23).

[9]     The trial court held five review hearings between February 3, 2014 and April 20, 2015. After each review hearing, the trial court found that Mother had not complied with Child's case plan, had not enhanced her parental abilities, and had not cooperated with DCS. As a result, the trial court changed the permanency plan to adoption on April 20, 2015.

[10]    On April 8, 2015, DCS filed its petition for termination. On July 13 and 27, 2015, the trial court held evidentiary hearings. At one of the hearings, Mother testified that she had difficulty attending drug screenings at DCS's office. She testified that she had supervised visitations on Tuesdays, Wednesdays, Fridays, and Saturdays, with visitation hours from 9 a.m. to noon and then from 1:30 p.m. to 3:30 p.m. She was required to call in between 8 a.m. and 9 a.m. each day to inquire if she was scheduled for a random drug screen that day. She was required to undergo three drug screens per week, with one drug screen conducted anytime between 9 a.m. and 3:30 p.m. on the scheduled day in DCS's office and the other two performed at her residence. On the days when her drug screens in DCS's office overlapped with her visitations, Mother had only 90 minutes to complete her screen and proceed to the visitation. She stated that the time window was not enough for her to attend all appointments as scheduled because she had no transportation. This was the first time she raised the issue.

[11]    The purpose of Mother's drug screenings was to determine if she was taking her prescribed medications. After Mother screened positive for cannabis in February and March of 2015, the purpose of the screens also became to

determine if Mother was using illegal drugs. Mother further testified she had not contacted DCS family case manager Khristen Scircle (FCM Scircle) to inform her about the scheduling issue. Despite the scheduling inconvenience, Mother also testified that the issue had not affected her visits with Child. She testified that either her home-based provider, arranged by DCS, or her father transported her to DCS's office for drug screenings whenever possible. Mother further stated that FCM Scircle never told her that she had to choose between taking drug screens or her visitations. Finally, FCM Scircle testified that Mother had not been denied any visitation time due to her having to screen on the same day as her visits.

[12] On September 8, 2015, the trial court entered its Order, terminating Mother's parental rights to Child and made the following findings:

> 37. . . . Mother did not make herself available for drug screens between December 19, 2014 and January 4, 2015. . . .
>
> 38. On February 12, 2015, Mother's visitation with [Child] was suspended after she tested positive for cannabis in a drug screen taken [on] February 4[, 2015]. Subsequently, Mother tested positive for cannabis in screens taken [on] March 12 and March 23, 2015. Mother failed to show for other scheduled drug screens. As a result, Mother missed most of the visits from February 27 through May 22, 2015.
>
> * * * *

52. At times Mother was cooperative [with] drug screens administered at her home, but often uncooperative to being drug screened at the DCS office.

\* \* \* \*

59. Mother's visitation has been inconsistent due to her refusal to submit to drug screens when requested or failed screens or her cancelling visits.

(Appellant's App. pp. 38-39, 43, 45).

[13] Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Vagueness*

[14] Initially, we note that Mother appeals after the trial court's termination of her parental rights to Child. However, in her appellate brief, she challenges neither the trial court's findings of fact nor its conclusions thereon. Mother's only contention is centered on the trial court's dispositional order that required her to participate in services following the trial court's adjudication of Child as a CHINS on September 30, 2013, and her difficulties in attending her appointments because of the alleged conflict in scheduling. As such, we conclude that Mother does not dispute DCS's evidence presented at the termination proceeding, the trial court's factual findings, its reliance on those findings, and its conclusions.

As to the trial court's dispositional order, Mother specifically argues that the trial court's order to "participate" in services was "unconstitutionally vague" because she did not "reasonably understand" the trial court's "participation" requirement. (Appellant's Br. pp. 10, 14). Mother acknowledges that the unconstitutional vagueness doctrine is used in criminal law context; however, she urges us to extend its application to the trial court's orders in a "civil/juvenile context." (Appellant's Br. p. 10). We decline her request.

First, Mother raises the issue for the first time on appeal. She raised it neither with the CHINS court nor during the termination proceedings. As such, we conclude that Mother waived the issue. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to raise an issue with the juvenile court constitutes waiver of that issue on appeal), *trans. denied*.

Second, Mother provides no legal authority for her argument. She cited to several cases where criminal defendants were challenging the criminal *statute* that served as the basis of their convictions on vagueness grounds. *See Lock v. State*, 971 N.E.2d 71, 74-75 (Ind. 2012) (the defendant challenged part of Indiana's motor vehicle code); *Brown v. State*, 868 N.E.2d 464, 467 (Ind. 2007) (the defendant challenged the criminal confinement statute). Mother, however, provided no authority permitting the application of the unconstitutional vagueness doctrine to court *orders* in civil cases. "We will not become an advocate for a party nor will we address argument[s] which are either inappropriate [or], too poorly developed or improperly expressed to be understood." *Thacker v. Wentzel,* 797 N.E.2d 342, 345 (Ind. Ct. App. 2003)

(quoting *Ramsey v. Review Bd. of Ind. Dep't of Workforce Dev.,* 789 N.E.2d 486, 486 (Ind. Ct. App. 2003)). As such, we conclude that Mother waived her argument. *See* Ind. Appellate Rule 46(A)(8)(a) (an appellant must support each argument with cogent reasoning and citations to the authorities, statutes, and the record); *In re J.V.,* 875 N.E.2d 395, 402 (Ind. Ct. App. 2007) (a party waives any issue raised on appeal where the party fails to develop a cogent argument or provide adequate citation to authority), *trans. denied.*

[18]     Moreover, in more than two years after the trial court issued its order, Mother never requested the trial court to clarify what "participation" meant. In those two years, the trial court conducted six CHINS review and permanency hearings where Mother was represented by counsel. However, Mother never filed a motion to clarify and never took any action to seek further guidance as to her alleged failure to reasonably understand the trial court's order. To the contrary, the record reveals that she understood what "participation" meant as she attended the services, the drug screens, and visitations. Because Mother had no vehicle, we are mindful that the 90-minute window might not be realistically sufficient to attend all required appointments using public transportation. Nevertheless, Mother never addressed these concerns to DCS. In fact, she testified at the termination hearing that she never actually missed her visitations with Child because she had either her home-based provider or her father transport her to DCS's office when needed. As such, we find no merit in Mother's argument and therefore refuse to address it.

## II. *Adequate Services*

In her second very brief argument, Mother asserts that because DCS failed to recognize the alleged scheduling issue and her lack of transportation, DCS created a conflict and did not provide the required services. For the same reasons discussed above, because Mother raised the issue for the first time on appeal and because she did not provide a cogent argument supported by citations to legal authority, we conclude that she waived her second issue as well. *See Thacker*, 797 N.E.2d at 345; *In re B.R.*, 875 N.E.2d at 373; App. R. 46(A)(8)(a). Moreover, as we have previously noted, "[T]he responsibility to make positive changes will stay where it must, on the parent. If the parent feels the services ordered by the court are inadequate to facilitate the changes required for reunification, then the onus is on the parent to request additional assistance from the court or DCS." *Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007). Because Mother should have raised the scheduling issue with DCS or the trial court prior to the termination hearing, but failed to do so for more than two years, we conclude that she should bear the responsibility for the failure.

Waiver notwithstanding, our review of the record indicates that DCS provided sufficient services to reunify Mother with Child. Mother argues that DCS created the conflict and that she lacked the transportation to attend her drug screenings in the 90-minute window between her visitations. However, she seems to ignore the fact that DCS also arranged the home-based provider to transport her to DCS's office for the screens when needed. Mother used the

services many times; all she needed to do was to call the provider. Alternatively, when the provider was not available, Mother called her father. With these arrangements, as she testified, Mother did not miss any visitations due to the required drug screens in DCS's office.

[21] In sum, Mother does not challenge the trial court's termination order or its findings of fact and conclusions of law. She only challenges the trial court's dispositional order entered at the outset of the CHINS proceeding, essentially arguing that her compliance with the order was inconsistent because she had difficulties in attending her required appointments. Because Mother raised the scheduling issue and the ensuing legal arguments for the first time on appeal and because her arguments were not cogent and lacked support in legal authority, we conclude that she waived these claims.

## CONCLUSION

[22] Based on the foregoing, we hold that Mother waived her challenge of the trial court's dispositional order on unconstitutional vagueness grounds and waived her argument as to DCS's alleged failure to provide services.

[23] Affirmed.

[24] Kirsch, J. and Pyle, J. concur