# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 21 2017, 8:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bryan M. Truitt
Bertig & Associates, LLC
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lazaro Miranda, a/k/a Randall Izquierdo, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | February 21, 2017 <br><br> Court of Appeals Case No. 64A03-1601-CR-124 <br><br> Appeal from the Porter Superior Court <br><br> The Honorable Mary R. Harper, Judge <br><br> Trial Court Cause No. 64D05-1405-FC-4132 |

**Kirsch, Judge.**

[1] Lazaro Miranda, a/k/a Randall Izquierdo ("Defendant") was convicted after a jury trial of forgery[1] as a Class C felony, was found to be a habitual offender[2] after a bench trial, and was sentenced to an aggregate fourteen-year sentence. He appeals and raises the following issue for our review: whether the State presented sufficient evidence to support his conviction for Class C felony forgery.

[2] We affirm.

## Facts and Procedural History

[3] At approximately 11:15 a.m. on May 7, 2014, Sergeant Alfred Villareal ("Sergeant Villareal") and Sergeant Michael Stewart ("Sergeant Stewart") of the Lake County Police Department's Drug Task Force Interdiction Unit ("the Interdiction Unit") were patrolling I-94, which leads to Michigan. The Interdiction Unit is involved in detecting criminal activity that occurs through the interstate highways, which includes the trafficking of drugs, weapons, and cash. On May 7, Sergeant Villareal and Sergeant Stewart were each in an unmarked police vehicle; Sergeant Villareal was parked in the median of the interstate, observing traffic, and Sergeant Stewart was driving on the interstate, monitoring vehicles.

---

[1] *See* Ind. Code § 35-43-5-2(b). We note that, effective July 1, 2014, a new version of this criminal statute was enacted. Because Defendant committed his crime prior to July 1, 2014, we will apply the statute in effect at the time he committed his crime.

[2] *See* Ind. Code § 35-50-2-8.

[4] Sergeant Stewart was driving behind a group of vehicles as the vehicles approached Sergeant Villareal's parked car. As the vehicles passed Sergeant Villareal, all of the vehicles except for one "did [the] typical reaction," which was to slow down to about 70 miles per hour, remain in their lanes, and keep driving past the police vehicle. *Tr*. at 128. One vehicle, however, slammed on its brakes, dropped its speed to about sixty to sixty-five miles per hour, and swerved over into the right lane without signaling its lane change. This drew Sergeant Stewart's attention because he considered it to be a "really unusual overcompensated action." *Id*. Sergeant Stewart continued to follow the vehicle for a period of time.

[5] Sergeant Stewart pulled up next to the vehicle and saw two individuals inside, who were both exhibiting "unusual" body language. *Id*. at 131. The driver was sitting very forward and very rigidly, was staring straight ahead, and had a "death grip" on the steering wheel. *Id*. The passenger, later identified as Defendant, was staring straight ahead and was also "very rigid" and "very stiff." *Id*. at 132. Sergeant Stewart thought the occupants of the vehicle "appeared . . . very nervous." *Id*. At that time, Sergeant Stewart slowed his car to pull behind the vehicle and activated his lights to initiate a traffic stop.

[6] After the vehicle had pulled over onto the shoulder of the highway, Sergeant Stewart approached the driver's side and observed that the driver was very "frantic," "shuffling around looking for documents." *Id*. at 133. Defendant was sitting still, staring straight ahead without blinking, refusing to make eye contact with the officer, and gripping a backpack tightly in his lap, which

Sergeant Stewart thought was further unusual behavior. The driver gave Sergeant Stewart his identification and registration, and Sergeant Stewart had the driver step out of the vehicle to come back to his police car to speak with him.

[7] While back in the police car, Sergeant Stewart ran the driver's information through his computer and asked the driver where he was headed. The driver responded that they were going to Grand Rapids, Michigan to visit a girl. When Sergeant Stewart inquired of the driver as to the name of the passenger, the driver stated that he was a friend he had known for about a year, but did not know his name. *Id*. at 136. Sergeant Stewart found this to be "pretty unusual and pretty suspicious," so he exited his car and walked to the passenger side to speak with Defendant. *Id*.

[8] Sergeant Stewart asked Defendant for his identification, what his name was, his date of birth, and where he was traveling. *Id*. at 137-38. Defendant told the officer that he did not have his identification, but informed Sergeant Stewart that his name was Lazaro Miranda and gave a date of birth. Although Defendant provided Sergeant Stewart with this information, it seemed to the officer that Defendant was "trying to think of something, like he was trying to make up a name and a date of birth." *Id*. at 137. In response to the question of where he and driver were traveling, Defendant told Sergeant Stewart that they were going to Grand Rapids for "some type of business." *Id*. at 138. During this conversation, Defendant "kept staring straight ahead," was acting very

"standoffish," "nervous," and "evasive," and was still clutching his backpack with a "death grip." *Id*. at 142-43.

[9] Because of their conflicting stories, Sergeant Stewart then went back to speak with the driver again to try to clear up the stories, but the driver stated they were not headed to Michigan for any type of business. *Id*. at 139-40. This led Sergeant Stewart to believe that the driver and Defendant were lying about where they were traveling. The driver continued to act nervous even though Sergeant Stewart told him he was not going to write him a ticket. Sergeant Stewart asked the driver for consent to search his vehicle, and the driver consented. The officer had the driver remain in the patrol car and went back to ask Defendant to exit the vehicle and sit inside the patrol car during the search.

[10] Defendant stepped out of the vehicle still clutching his backpack, and Sergeant Stewart asked him if he had anything illegal in it; Defendant said that he did not. *Id*. at 146. Sergeant Stewart then asked for consent to search the backpack, and Defendant gave his consent. Sergeant Stewart asked Defendant to leave the backpack in the vehicle, and Defendant agreed and went to sit in the patrol car. Meanwhile, Sergeant Villareal arrived on the scene and assisted Sergeant Stewart in his search of the vehicle. While the officers searched the vehicle and the backpack, the driver and Defendant watched from the patrol car and spoke to each other in Spanish, which was recorded on the camera inside of Sergeant Stewart's car. When the officers started to search the backpack, Defendant said to the driver, "are they searching my bag?" *Id*. at 103.

In their search of the backpack, the officers found two white envelopes containing what looked to be United States currency, all in fifty-dollar bills. Inside one of the envelopes, the bills were separated into four or five sections with white "divider" papers, which the officers found odd because they had never seen money packaged that way during their careers. *Id.* at 112, 152. When the officers touched the currency, they noticed that the "feel" of the money did not seem normal and that the bills were "too crisp." *Id.* at 79, 81, 108. The bills did not have a visible hologram, multiple bills had the same serial number, the printing was blurry and "not accurate," the color of the bills seemed off, and the security strip "stood out a little bit too much." *Id.* at 79-81, 114, 174. The officers found forty-eight bills, totaling $2,400, which they believed to be, and was later determined to be, counterfeit money.

Also inside of the backpack, the officers found handwritten directions to Grand Rapids, Michigan, a pre-paid "burner-type" phone, and two wallets. *Id.* at 152, 156, 159-60. One wallet contained $1,900 in legitimate United States currency and a photograph of a woman and a man, who looked like Defendant, but no identification. *Id.* at 107, 152. The officers also found thirteen small pieces of paper inside the backpack that contained descriptions of electronics equipment, a price for the items, an address, and a phone number with a Grand Rapids area code. When the officers looked into the trunk of the vehicle, they found two "big empty . . . shipping-type boxes," but no suitcases, clothing, briefcases, or computers that might have indicated an overnight business trip to support the story given by Defendant. *Id.* at 166.

The officers placed the driver and Defendant under arrest. When they arrived at the Lake County Jail, Defendant could not be processed because he would not provide his date of birth, address, or any other identifying information. Defendant had to be identified by running his fingerprints through the NCIC database. Through the search, the police learned Defendant's name was Randall Izquierdo and not Lazaro Miranda.

On May 12, 2014, the State charged Defendant with Class C felony forgery. The State amended the charging information on May 19 to add Randall Izquierdo as an alternate name for Defendant and to add a charge of Class D felony identity deception. On October 1, 2015, the State filed its notice of habitual offender enhancement. A jury trial was held, and after the State rested its case, Defendant moved for a directed verdict on the identity deception charge, which the trial court granted and dismissed the charge. The jury later found Defendant guilty of Class C felony forgery. Defendant waived his right to a jury trial on the habitual offender enhancement, and after a bench trial, the trial court found Defendant to be a habitual offender. At sentencing, the trial court sentenced Defendant to six years for the forgery conviction, enhanced by eight years for the habitual offender finding, resulting in an aggregate sentence of fourteen years. Defendant now appeals.

## Discussion and Decision

The deferential standard of review for sufficiency claims is well settled. When we review the sufficiency of evidence to support a conviction, we do not reweigh the evidence or assess the credibility of the witnesses. *Boggs v. State,*

928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied.* We consider only the evidence most favorable to the verdict and the reasonable inferences that can be drawn from this evidence. *Fuentes v. State,* 10 N.E.3d 68, 75 (Ind. Ct. App. 2014), *trans. denied.* We also consider conflicting evidence in the light most favorable to the trial court's ruling. *Oster v. State,* 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), *trans. denied.* We will not disturb the jury's verdict if there is substantial evidence of probative value to support it. *Fuentes,* 10 N.E.3d at 75. We will affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Lock v. State,* 971 N.E.2d 71, 74 (Ind. 2012). As the reviewing court, we respect "the jury's exclusive province to weigh conflicting evidence." *McHenry v. State,* 820 N.E.2d 124, 126 (Ind. 2005).

[16] Defendant argues that the State failed to present sufficient evidence to support his conviction for Class C felony forgery. Specifically, he contends that the evidence presented at trial was insufficient to prove that he had the intent to defraud. Defendant asserts that there was no evidence that he had knowledge that he possessed counterfeit money and claims that the counterfeit bills were not so obviously fake as to alert an ordinary person and give him knowledge that they were not legitimate currency. He further alleges that the evidence that he acted nervously was because he was an illegal immigrant and had a warrant out for his arrest in Florida.

[17] Defendant's charging information read in pertinent part:

> [O]n or about 7th day of May, 2014, in the County of Porter, State of Indiana, [Defendant], with the intent to defraud, makes,

utters or possesses a written instrument, numerous counterfeit United States Currency fifty dollar bills, in such a manner that they purport to have been made by another person; at another time; with different provisions; or by authority of one who did not give authority . . . .

*Appellant's App*. at 97. In order to convict Defendant of forgery as a Class C felony, the State was required to prove beyond a reasonable doubt that he, with the intent to defraud, made, uttered, or possessed a written instrument in such a manner that it purported to have been made by another person, at another time, with different provisions, or by authority of one who did not give authority. Ind. Code § 35-43-5-2(b).

[18] Defendant only argues that insufficient evidence was presented to prove the intent to defraud element of his conviction. "Proof of intent to defraud requires a showing the defendant demonstrated 'intent to deceive and thereby work a reliance *and injury*.'" *Bocanegra v. State*, 969 N.E.2d 1026, 1028 (Ind. Ct. App. 2012) (emphasis in original) (quoting *Wendling v. State,* 465 N.E.2d 169, 170 (Ind. 1984)), *trans. denied*. Actual injury is not required; potential injury is enough. *Id*. "Intent to defraud may be proven by circumstantial evidence which will often include the general conduct of the defendant when presenting the instrument for acceptance." *Miller v. State,* 693 N.E.2d 602, 604 (Ind. Ct. App. 1998) (citing *Wendling,* 465 N.E.2d at 170). Because intent is a mental state, the fact-finder often must look to the reasonable inferences based upon an examination of the surrounding circumstances to ascertain whether there is a showing or inference of the requisite criminal intent. *Brown v. State*, 64 N.E.3d

1219, 1232 (Ind. Ct. App. 2016) (citing *Diallo v. State,* 928 N.E.2d 250, 253 (Ind. Ct. App. 2010)). In making this determination, the fact-finder looks to the person's conduct and the natural consequences therefrom. *Id.* Further, a defendant's knowledge of the falsity of a written instrument is not a separate element of the crime of forgery, but such knowledge may be relevant to show a defendant's intent to defraud. *Benefield v. State*, 904 N.E.2d 239, 245 (Ind. Ct. App. 2009), *trans. denied*.

[19] In the present case, the evidence most favorable to the verdict showed that Defendant was found in possession of forty-eight counterfeit fifty-dollar bills, totaling $2,400. When the car that Defendant was a passenger in was pulled over, Defendant sat in the front seat staring straight ahead, was "very rigid" and "very stiff," refused to make eye contact with the officer, was gripping a backpack tightly in his lap, and "appeared . . . very nervous." *Tr.* at 132-133. This behavior, coupled with the fact that Defendant and driver told conflicting stories about where they were traveling, caused Sergeant Stewart to believe that Defendant was being evasive and lying to him. Throughout Sergeant Stewart's conversation with Defendant, Defendant continued to avoid eye contact and tightly grip his backpack. Defendant's behavior of avoiding eye contact with Sergeant Stewart, clutching the backpack, and lying to the officer created a reasonable inference that Defendant was hiding something and knew that the backpack contained counterfeit money.

[20] Further, Defendant continued to act evasively and lie to Sergeant Stewart as the conversation progressed. When the officer asked Defendant for identification,

Defendant told Sergeant Stewart that he did not have any identification, and instead, hesitated in giving his name and date of birth, which both later turned out to be false. Defendant never told the officers his real name; his true identity was eventually learned through his fingerprints after arrest. When Sergeant Stewart searched Defendant's backpack, he discovered the large quantity of counterfeit bills inside. Defendant did not just have a few counterfeit bills in his backpack; there were forty-eight bills, totaling $2,400. Additionally, the "feel" of the money did not seem normal, the bills were "too crisp," the bills did not have a visible hologram, multiple bills had the same serial number, the printing was blurry and "not accurate," the color of the bills seemed off, and the security strip on the bills "stood out a little bit too much." *Id.* at 79-81, 108, 114, 174. Given the quantity and quality of the bills found inside the backpack, it was reasonable for the jury to infer that Defendant knew the money was counterfeit.

[21] Further evidence found in Defendant's backpack also added to the inference that he knew that the money was counterfeit and that he had the intent to defraud. The counterfeit bills were unusually stored in a white envelope, separated in small bundles by white "divider" papers. *Id.* at 152. Sergeant Villareal testified that he had never seen money stored in that manner. *Id.* at 112. The officers also found inside the backpack handwritten directions to Grand Rapids, a "burner-type" phone, *tr.* at 159, two wallets that contained no identifying information, and thirteen white slips of paper that contained descriptions of electronics equipment, a price for the items, an address, and a phone number with a Grand Rapids area code. Based on this evidence, it could

be reasonably inferred that Defendant intended to use the counterfeit money to purchase electronic equipment in Grand Rapids and defraud the sellers of the equipment who lived in another state, which would make it harder to locate him. We, therefore, conclude that there was sufficient evidence presented from which a reasonable jury could infer that Defendant possessed the counterfeit money with the intent to defraud. Defendant's arguments to the contrary are merely requests for this court to reweigh the evidence, which we cannot do. *Boggs,* 928 N.E.2d at 864. The State presented sufficient evidence to support Defendant's conviction for Class C felony forgery.

[22] Affirmed.

[23] Robb, J., and Barnes, J., concur.